## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## JONESBORO DIVISION

JAMES McMILLIN                                                              PLAINTIFF

v.                                      NO. 3:06CV00139JLH

MICHAEL J. ASTRUE, Commissioner,[1]
SOCIAL SECURITY ADMINISTRATION                                             DEFENDANT

## OPINION

James McMillin brings this action under 42 U.S.C. § 405(g) and § 1383(c)(3), for judicial

review of a final decision of the Commissioner of Social Security denying his claim for disability

insurance benefits and Supplemental Security Income benefits under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 423, 1381-1382c.  Both parties have submitted briefs, and the case is

ready for disposition.

## I.

McMillin filed an application for disability insurance benefits and SSI on December 18,

1996, alleging disability beginning February 28, 1996, due to sleep apnea, high blood pressure, and

pain in his lower back, legs, and knees.  (Tr. 92, 86-89, 189-92.)  His claims were denied initially

and upon reconsideration. (Tr. 77-78, 81, 195-96, 199.)  Pursuant to McMillin's request, a hearing

was conducted by Administrative Law Judge Paul Rawlings on September 19, 1997. (Tr. 35-72.)

On January 29, 1998, Judge Rawlings denied McMillin's claim for benefits.  (Tr. 15-28.)   On

May 19, 1999, the Appeals Council denied McMillin's request for review.  (Tr. 5-7.)  McMillin

---

[1] Michael J. Astrue was sworn in as Commissioner of the Social Security Administration on February 12, 2007.  He is therefore substituted for Jo Anne B. Barnhart under Rule 25(d)(1) of the Federal Rules of Civil Procedure.

appealed to this Court, which remanded the case to the Commissioner on June 27, 2000, to develop the record further.  (Tr. 295-303.)

Administrative Law Judge Gary Shelton conducted a second administrative hearing on August 15, 2000.  (Tr. 250-74.)  On August 24, 2000, Judge Shelton denied McMillin's claim.  (Tr. 315-23.)  McMillin requested review of Judge Shelton's decision, and on March 6, 2001, the Appeals Council remanded the case.  (Tr. 326-29.)  Two days later, McMillin filed additional applications for disability insurance benefits and SSI, alleging a revised onset date of August 25, 2000.  (Tr. 414-16, 496-99).  The Commissioner denied these claims on initial determination and reconsideration, and combined all of McMillin's applications for benefits for review.  (Tr. 370, 396-97, 402-03.)

On May 10, 2001, Administrative Law Judge Robert Neighbors conducted a third administrative hearing.  (Tr. 275-94.)  Judge Neighbors denied McMillin's claim on November 21, 2001.  (Tr. 224-38.)  The Appeals Council denied review on July 22, 2002, and McMillin again appealed to this Court for review.  (Tr. 216-18).  The Commissioner, however, requested remand of the case for further development of the record, which this Court granted on March 9, 2004.  (Tr. 393-95, 404-07).

Judge Neighbors conducted a fourth hearing on March 23, 2005.  (Tr. 504-28.)  Judge Neighbors again denied McMillin's claim on March18, 2006.  (Tr. 366I-79.)  The Appeals Council declined to assume jurisdiction of McMillin's claim on June 23, 2006, making Judge Neighbors's March 18, 2006, decision the final decision of the Commissioner.  (Tr. 366-66B.)  McMillin now seeks judicial review of that decision.

## II.

McMillin has the burden of proving his disability by establishing a physical or mental impairment lasting at least one year that prevents him from engaging in any substantial gainful activity. 42 U.S.C. §1382c(a)(3)(A); *Baker v. Apfel*, 159 F.3d 1140, 1143 (8th Cir. 1998); *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997).

The Court's function on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. In determining whether existing evidence is substantial, we consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.

*Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000) (citations omitted).

## III.

### A.    Medical Evidence

McMillin was born on September 2, 1963. He has obtained his GED. (Tr. 38.) He has past relevant work experience as a service station attendant, molding machine operator, factory worker or machine operator, and security guard. (Tr. 371.) At the time of the 2005 hearing McMillin was employed as a security guard. (Tr. 512-13.)

McMillin began seeing Dr. Craig McDaniel in February 1995. Dr. McDaniel noted that McMillin's blood pressure "look[ed] good" at that time but that McMillin had a history of high blood pressure for which he took prescription medication. Dr. McDaniel also noted that McMillin

smoked; was morbidly obese, weighing 342 pounds; and had symptoms of obstructive sleep apnea.

Dr. McDaniel recommended that McMillin diet, exercise, and stop smoking.  (Tr. 169.)

In December 1995, McMillin saw Dr. Meredith Walker at the Sleep Disorders Center of Northeast Arkansas at St. Bernard's Regional Medical Center in Jonesboro, Arkansas.  Dr. Walker noted that McMillin reported falling asleep easily and then waking two or three times during the night for brief periods, about two to three minutes.  McMillin reported that during the daytime he often became sleepy at work, fell asleep easily when inactive, and sometimes fell asleep while driving.  Dr. Walker found that McMillin had "severe redundant tissue in his posterior pharynx."  Dr. Walker's impression was that McMillin had "[p]robable obstructive sleep apnea with daytime somnolence" and "[s]evere obesity."  She recommended that McMillin stop smoking and undergo a formal sleep study.  (Tr. 181-83.)

In February 1996, following McMillin's sleep study, Dr. Walker stated that he had severe obstructive sleep apnea.  She noted that his sleep efficiency was 89%, his sleep maintenance efficiency was 90%, and that his "[s]leep architecture is normal," but he "did not go into REM sleep until CPAP [continuous positive airway pressure] was started."  The CPAP, however, "[m]arkedly improved" McMillin's sleep apnea.  (Tr. 170.)

In December 1996, Dr. McDaniel reported that McMillin "has a lot of back problems.  His dad is on disability for his back and James says he's doing to try to get his disability.  He has no known injury but he wants me to work up his back pain.  We'll do that in a few weeks when he comes back in to get his blood pressure checked."  (Tr. 167.)

At McMillin's next appointment with Dr. McDaniel, which occurred in February 1997, Dr. McDaniel noted that McMillin's cardiac, pulmonary, and vascular exam were normal, that his blood pressure was "a lot better," and that he had lost about 40 or 50 pounds by dieting.  Dr. McDaniel

4

opined that McMillin might be able to stop taking blood pressure medications if he lost another 50 or 60 pounds.  (Tr. 167.)

On that day, Dr. McDaniel made no mention of any examination or tests related to McMillin's back but noted that McMillin reported "some back pain that radiates down his left leg." According to Dr. McDaniel, McMillin had "been digging some ditches around his house.  It just started last night."  Dr. McDaniel prescribed a muscle relaxer, Norflex, and noted that McMillin had "already started some ibuprofen with relief."  About a month later, however, Dr. McDaniel wrote that McMillin was "currently unable to work due to back pain and sleep apnea."  (Tr. 167.)

On April 29, 1997, Dr. Jacob Williams evaluated McMillin for the state agency, Disability Determination for Social Security Administration.  According to Dr. Williams, McMillin's respiratory, cardiovascular, gastrointestinal, and neurological systems were all normal.  McMillin had normal limb function and range of motion in his spine and extremities.  He had the ability to stand and walk without assistive devices, including the ability to walk on heel-toes, and could squat and arise from a squatting position.  His gait, coordination, and strength were normal.  Dr. Williams reported that x-rays of McMillin's spine revealed normal curvature, no exostosis, and no narrowing of intervertebral space, and x-rays of McMillin's knee showed  no evidence of arthritic changes and no joint space narrowing.  Dr. Williams thus stated that McMillin had a "normal x-ray of spine" and diagnosed him with a "normal" left knee.  Nevertheless, Dr. Williams diagnosed McMillin with chronic lumbar strain and chronic left knee pain and stated that his ability to stand and walk were limited to "25% of normal."  (Tr. 171-78.)

In March 1998, McMillin saw Dr. Walker again, complaining of frequent colds and nasal irritation due to his CPAP treatment.  Dr. Walker reported, however, that Walker was "doing much

better from a sleep apnea standpoint." She prescribed nasal sprays for his irritation and told McMillin to notify her if his problems persisted. (Tr. 460-61.)

Also in March 1998, McMillin went to the Jonesboro Church Health Center complaining of back pain. The nurse practitioner who saw McMillin assessed him as having hypertension (high blood pressure), obesity, and chronic back pain. She prescribed Monopril for his hypertension and recommended that he diet, exercise, keep a food diary, and return in one month. She also referred McMillin for an x-ray of his back. McMillin returned the next month and reported that he had numbness in his legs if he stood a lot or did chores that required bending. The nurse practitioner who saw him during that visit assessed him with hypertension, sleep apnea, and chronic back pain, but noted that he was "doing better" on the Monopril that his "x-ray looked O.K." She also noted that McMillin was "trying to get disability." (Tr. 214-15.)

In January 2001, McMillin underwent a lumbar spine series with Dr. Edwin Bird of the radiology department at Arkansas Methodist Hospital in Paragould. Dr. Bird reported:

> The pedicles appear intact. Vertebral body heights are maintained. Intervertebral space narrowing is present at L5-S1 level with vacuum phenomena and sclerotic change at adjacent bony surfaces. No spondylolysis or spondylolisthesis is seen.

> OPINION:    Degenerative change at L5-S1 level with intervertebral space narrowing and vacuum phenomena.

(Tr. 365.)

Later that month, McMillin underwent an MRI of the lumbar spine, which was ordered by Dr. Michael Langley and read by Dr. Mark Newman. Dr. Newman reported that McMillin had "grade I retrolisthesis of L5 on S1" and "broad based disc bulge" which "narrows the neuroforamina bilaterally and may affect the exiting L5 nerve roots." McMillin also had "a broad based disc bulge at L4-L5," but it did not "result in any significant stenosis." (Tr. 350-51.)

Dr. Langley referred McMillin to Dr. Dewayne Eubanks, a neurosurgeon, who evaluated McMillin in May 2001.  McMillin complained of chronic low back pain that worsened with activity, headaches, numbness, limited movement, shortness of breath, swelling, and frequent irritability.  Dr. Eubanks noted that McMillin was "currently not having any lower extremity symptoms although he says that several years ago he had an episode of pain he thinks down the left lower extremity into his foot but it improved with non-surgical management although his numbness hung around for a few months."  On examination, Dr. Eubanks found that McMillin had "[e]dema bilaterally in the lower extremities" and that his range of motion in his back was "severely restricted because of his body habitus," but that McMillin had normal strength and sensation.  Dr. Eubanks reported that McMillin's MRI scan showed "some mild degenerative disc disease at L3-4 and L4-5 and some marked degenerative disc disease at L5-S1."  Dr. Eubanks concluded, however, that McMillin's morbid obesity was the cause of 98% of his back pain and that if he reduced his weight down to about 200 pounds, his back pain would go away.  (Tr. 362-63.)

McMillin went to the Jonesboro Church Health Center on May 30, 2001, asking to be tested for diabetes.  (Tr. 462.)  When he returned on June 28, 2001, he was diagnosed with diabetes and hypertension.  He was prescribed no treatment for his diabetes, however, except "diabetic education."  (Tr. 488.)

On December 19, 2001, Dr. Langley completed a Medical Source Statement for McMillin. According to Dr. Langley, McMillin could frequently lift and carry less than ten pounds; stand or walk up to three hours in an eight-hour work day, continuously for one half hour; and sit for three hours in an eight-hour work day, continuously for one half hour.  Dr. Langley described McMillin's ability to push or pull as limited, writing that "any of this could dislodge the spine."  Dr. Langley further stated that McMillin could never climb, balance, stoop, kneel, crouch, or bend, and that his

ability to reach was   limited.   When asked to describe the clinical or laboratory findings that supported these limitations, Dr. Langley wrote "spondylolisthesis demonstrated on MRI."   Dr. Langley also indicated that he considered McMillin's subjective complaints of pain in reaching his conclusions as to McMillin's physical abilities.  (Tr. 472-73.)

In March 2002, McMillin went to the Jonesboro Church Health Center for a check-up.  He asked for a refill on his medication and complained of back pain.  The nurse practitioner who saw him that day refilled his prescription for his hypertension medication and recommended he take ibuprofen as needed for his back pain.  (Tr. 486.)

In February 2003, McMillin saw a chiropractor, Dr. Stephen Duncan, three times.  McMillin complained of low back pain and leg numbness.  Dr. Duncan wrote that he found sacral and lumbar subluxation with muscle spasm upon examining McMillin.  Dr. Duncan performed three adjustments on McMillin that month, after which McMillin reported that he was feeling better but still having some discomfort.  (Tr. 474.)

McMillin returned to the Jonesboro Church Health Center in August 2003 due to a build-up of ear wax.  The nurse practitioner who saw him noted that he was taking no medication for his elevated blood sugar, but usually controlled it with diet.  She recommended a diabetic education class for him.  (Tr. 483.)  When McMillin returned the next month, the nurse practitioner who saw him noted that he may need to start on Glucophage if his blood sugar increased.  (Tr. 482.)

McMillin went to the Jonesboro Church Health Center again in March 2004 to have his diabetes checked.  A nurse practitioner again noted that he may need to start taking Glucophage.  (Tr. 494.)  When he returned in May 2004, the nurse practitioner who saw him prescribed Glucophage. (Tr. 493.)

**B.      Administrative Hearings**

**1.      1997 Hearing**

At the 1997 hearing, McMillin initially testified that his most severe physical problem was his sleep apnea but later said that pain was more of a problem.  (Tr. 46, 61.)  He said that he used a CPAP machine for his sleep apnea but took no medications for it.  (Tr. 49-50.)  McMillin testified that on average he would fall asleep three or four times during the day for about one hour.  Later in the hearing, he said that if he used his CPAP machine and got a good night's sleep he would be able to work without falling asleep the next day.  (Tr. 47, 61.)  McMillin also testified that when he gets a cold he is unable to use the machine.  (Tr. 56-57.)  McMillin's wife, Sheila McMillin, testified that McMillin gets a cold and is unable to use the machine one or two nights every one to two months.  She said that when he is unable to use the machine McMillin is not very alert the following day and that "his face is all puffy and swollen," but as long as he is able to use the machine he does not fall asleep during the day.  (Tr. 66-67.)

McMillin testified that in addition to his sleep apnea, he had pain in his lower back and in his legs down to his knees, and numbness in his legs and feet. (Tr. 50-51, 53-55.)  McMillin said that he had had a "spell" with his back in February of that year.  He testified that his doctor had prescribed medication for it, which relieved the pain but not the numbness.  (Tr. 53-54.)  As noted above, McMillin's medical records show that he saw Dr. McDaniel for back pain in February 1997 after he had "been digging some ditches around his house," and Dr. McDaniel prescribed a muscle relaxer.  McMillin testified that he was taking no medications for either pain or numbness at the time of the 1997 hearing, however, and got relief from lying down.  (Tr. 52-53.)

McMillin also testified that he had high blood pressure for which he took medication, but that his blood was "pretty well under control." He said that his doctor had advised him to lose weight to help with his blood pressure, and that he had lost about 20 or 25 pounds at that point. (Tr. 54-56.)

When asked about his daily activities, McMillin testified that he drove a car, visited people, went to church about once a month, went to movies or out to eat with his wife occasionally, and watched TV a lot. (Tr. 57-58.)

When asked about his ability to work, McMillin initially said that he could not work eight hours a day, five days a week. (Tr. 45-46.) He said that he could stand for about three hours out of an eight-hour workday and sit for about two hours at a time. (Tr. 51-52.) McMillin testified, however, that he did not know whether he could work if he had a job where he could alternate between sitting and standing. (Tr. 52.)

### 2.    2000 Hearing

At the 2000 hearing, McMillin again testified that he had sleep apnea, obesity, high blood pressure, low back pain, and pain and numbness in his legs. He testified that he would "get a cold once in a while" and that it would prevent him from using his CPAP machine for sleep apnea, causing him to be very tired and doze off frequently the next day. (Tr. 261-63.) McMillin also testified that he continued to take medication for his blood pressure and that the medication controlled it, but that he had had to increase the dosage of his medication during the previous year to maintain this result. (Tr. 263.) As to his pain and numbness, McMillin testified that he believed that his weight caused his back pain, that it hurt if he bent over very much, and that standing "for just a short time" caused pain in his knees and numbness in his legs. (Tr. 262, 264.)

When asked about his physical abilities, McMillin testified that he could sit for about an hour, walk for about 30 minutes, climb, crawl, push and pull things, and lift and carry light objects.

(Tr. 258-60.)  He said that he could not run or jump and that while he could squat, he could not do so very well.  (Tr. 259.)  McMillin said that he had normal strength in his hands and that he could probably move a five-pound weight back and forth for five minutes.  (Tr. 259-60.)

When asked about his daily activities, McMillin testified that he would watch TV, help his wife with her babysitting, drive a car 50-100 miles per week, visit friends and relatives, go to church three times a week, bathe and groom himself, and wash dishes once in a while.  (Tr. 255, 257-58.) He said that he had not worked since 1996.  (Tr. 256.)

Bob White, a vocational expert, also testified at the 2000 hearing.  He characterized McMillin's prior work at a frame factory as light and unskilled; his job changing tires as heavy; his service station attendant work as light; his farm work as heavy and unskilled; and his janitorial work as medium and unskilled.  (Tr. 269-71.)

In his first hypothetical question to White, the ALJ described an individual 36 years of age with a GED who could perform a full range of medium work and asked if such an individual could perform McMillin's past relevant work.  White said that such an individual could not do the tire changing work, but could do the remainder of the service station attendant job, as well as the janitorial and factory work.  If the  individual were limited to light work, he could do the service station attendant's job and the factory work.  If the hypothetical individual were limited to sedentary work, however, he could not perform McMillin's past relevant work.  (Tr. 270-72.)

When asked whether such an individual limited to a full range of sedentary work could perform other jobs, White said he could perform assembler jobs.  (Tr. 272.)  The ALJ then asked about an individual limited to sedentary work who could not sit, stand, or walk for more than one hour at a time.  White testified that such an individual could perform assembly work for Lucent

Industries or Maybelline.  If the individual could not perform a full range of sedentary work, however, he could not perform even those jobs.  (Tr. 272-73.)

### 3.   2001 Hearing

McMillin testified at the 2001 hearing that he could not work any job full-time.  He said that standing for long periods caused pain in his back and left knee and numbness in his legs.  (Tr. 284.) McMillin also said that he could walk for about 30 minutes before having symptoms and would be ready to sit down after about 45 minutes.  (Tr. 285.)  He said that he could sit for about an hour or an hour and a half, but probably less if he were using his hands.  (Tr. 287.)  For relief, he would take pain medication and lie down.  (Tr. 286.)  When asked about his pain medication, McMillin stated that he usually took one dose per day, but did not specify what type of medication he took.  (Tr. 290.) In a questionnaire dated April 17, 2001, McMillin wrote that he took "Buta/APA/CaF Tab 50/325" for pain.  (Tr. 442.)

McMillin again testified that he took medication for his blood pressure.  (Tr. 291.)  He said that he could check his blood pressure at home and that it "seems to always run just a little bit high," typically around 160 over 90, but that he had no symptoms from it.  (Tr. 290-91.)

McMillin also testified that he continued to have trouble with his sleep apnea.  He said that he used his CPAP machine every night and that it worked pretty well, except when he had a cold or allergies.  (Tr. 292.)

When asked about his daily activities, McMillin said that he bathed and cared for his personal needs, helped some with household chores such as laundry, watched TV, went to church three times a week, visited friends and relatives, and helped care for his son, who was almost two years old.  (Tr. 288-89.)  McMillin said that he could lift his son, who weighed about 25 or 30 pounds, and change his diapers.  (Tr. 289.)  In the April 17, 2001, questionnaire, McMillin also wrote that he could

change sheets, take out trash, wash the car, mow on a riding mower, shop for groceries and clothes, and go to the bank and the post office, but that these activities were limited by back pain and numbness in his legs.  (Tr. 440.)

### 4.      2005 Hearing

At the 2005 hearing, McMillin testified that he did not work from February 1996 until approximately January 1, 2002.  (Tr. 513).  McMillin began working as a security guard at an industrial site sometime between Christmas and New Year of 2001.  He worked 24 hours a week and stated that he could and would have worked 40 hours a week at this job if he had been given the opportunity.  (Tr. 515-16.)  He accepted a full-time position as a security guard from about March to September 2002 but went back to his position working 24 hours a week because the full-time position was about 50 miles from his home and the commute cost too much of his paycheck.  (Tr. 517-18.)  After about a year working part-time again, McMillin went to work full-time as a machine operator at Martin Sprocket & Gear for about six months.  (Tr. 512, 519, 525.)  McMillin left his job at the factory to return to work as a security guard, and he was still working in this position 32 hours a week at the time of the 2005 hearing.  (Tr. 508, 519-20.)  The work involved making hourly rounds to check two buildings, answering phones, and watching TV surveillance cameras in the office.  (Tr. 520-23.)  This job did not involve much standing or walking, however, because McMillin used a golf cart to make rounds.  (Tr. 522-23.)

Dr. Vance Sales, a vocational expert, testified at the 2005 hearing.  Dr. Sales characterized work as a security guard as light and semiskilled, but said that McMillin's most recent position ranged between sedentary and light.  (Tr. 524.)  Dr. Sales said that the machine operator position that McMillin held at Martin Sprocket & Gear was light and unskilled.  (Tr. 519, 525.)  According to

McMillin, that position did not involve bending but required standing most of the time.  (Tr. 525.)
The ALJ did not ask Dr. Sales any hypothetical questions.  (Tr. 527.)

## IV.

The ALJ undertook the familiar five-step analysis in determining whether McMillin was disabled. The five-step sequential evaluation determines: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe and medically determinable physical or mental impairment; (3) whether the claimant may be deemed disabled because  the impairment meets or equals a listed impairment in Appendix 1 to Subpart P, Title 20, Code of Federal Regulations; (4) whether the claimant is able to return to past relevant work, despite the impairment; and if not (5) whether the claimant can perform any other kind of work.  20 C.F.R. §§ 416.920 and 404.1520.  *See Cox v. Barnhart*, 345 F.3d 606, 608 n.1 (8th Cir. 2003).

In his March 18, 2006, decision, the ALJ said that McMillin had engaged in substantial gainful activity from January 1, 2001,[2] through the date of the decision, but had not engaged in substantial gainful activity at all times since the originally alleged onset date of February 28, 1996. (Tr. 377.)   The ALJ found that McMillin has a history of hypertension; sleep apnea; spondylolisthesis and degenerative disc disease of the lumbar spine; morbid obesity; and probable diabetes mellitus controlled by diet alone.  (Tr. 377.)  The ALJ found, however, that while these impairments are severe, they do not, singly or in combination, meet or equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 377.)

---

[2]  As discussed below, the ALJ erred in stating that McMillin returned to work on January 1, 2001.  The record reflects that McMillin returned to work sometime during the week after Christmas of 2001, which the ALJ during the hearing characterized as "roughly January 1 of '02[.]"  (Tr. 513.)

The ALJ evaluated McMillin's subjective allegations and complaints pursuant to the criteria set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). These include the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. *Id.* at 1322. The ALJ found McMillin's subjective allegations not to be fully credible based on the medical evidence and other evidence of record. (Tr. 377.)

The ALJ found that McMillin has the residual functional capacity to perform a wide range of light work. (Tr. 377.) He found that McMillin is capable of occasionally lifting and carrying up to 20 pounds and frequently lifting and carrying up to 10 pounds. The ALJ also found that McMillin is capable of sitting for a total of six hours in an eight-hour work day and walking or standing for a total of six hours in an eight-hour workday. (Tr. 377-78.) Relying on the testimony of the vocational expert and McMillin, the ALJ determined that McMillin's past relevant work as a factory worker and a security guard could be performed at the light exertional level. The ALJ thus found that McMillin could perform these jobs and is not disabled within the meaning of the Social Security Act. (Tr. 378-79.)

## V.

McMillin advances four arguments in support of his position that the Commissioner's decision is not supported by substantial evidence on the record as a whole. First, McMillin asserts that the ALJ erred in finding that he engaged in substantial gainful activity beginning in January 2001. Second, McMillin argues that the ALJ erred in finding that he could perform light work. Third, McMillin contends that the ALJ failed to consider his obesity and sleep apnea. Finally,

McMillin argues that the ALJ erred by not obtaining vocational expert testimony as to McMillin's ability to work.  Each of these issues is addressed separately below.

A.     **The ALJ's erroneous statement that McMillin engaged in substantial gainful activity beginning in January 2001 was not a material error.**

The ALJ misstated that McMillin returned to work in January 2001, as the record reflects that he returned to work during the week after Christmas of 2001, which the ALJ characterized during the hearing as "roughly January 1 of '02[.]"  (Tr. 513.)  McMillin argues:

> The distinction between January 2001 and January 2002 is important because of the medical evidence.  The ALJ noted that finding in January 2001 showed that McMillin had degenerative disk [sic] disease, but he went on to say that the findings "were discovered within a few days of the time the claimant actually returned to work" (Tr. 373).  Clearly, this statement loses its force if McMillin did not return to work for nearly a year after these findings were made.

The Court agrees that the ALJ's statement that the medical findings "were discovered within a few days of the time" that McMillin returned to work has no force in light of the ALJ's mistake as to the date, and this mistake might be material if the ALJ had based his decision on it.  The ALJ's written decision as a whole, however, demonstrates that he did not do so.  In his decision, the ALJ discussed McMillin's medical records and his testimony as to his pain and alleged physical limitations at length before determining that McMillin's impairments did not prevent him from performing some of his vocationally relevant past jobs for a continuous period of at least 12 months during the pertinent time period.  The objective medical evidence showed only mild abnormalities in McMillin's spine, and nothing in the ALJ's decision suggests that the evidence of "mild degenerative disc disease" would have led him to conclude that McMillin was rendered unable to work by this condition from January 2001 to January 2002 had the ALJ noted that McMillin was not working during this time.

16

Because the ALJ conducted a proper analysis of the evidence and based his decision on the evidence as a whole, his mistake as to the date that McMillin returned to work is not a material error warranting reversal or remand.  *See Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir. 1987) ("[a]n arguable deficiency in opinion-writing technique [regarding a claimant's work history] is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably had no practical effect on the outcome of the case").

**B.      The ALJ properly found that McMillin can perform light work.**

McMillin argues that the record does not support the ALJ's finding that he could perform light work activity for the entire period in question.  Light work requires standing or walking, off and on, for a total of six hours of an eight-hour workday.  S.S.R. 83-10.  McMillin asserts that he cannot do this, pointing to Dr. Williams's 1997 statement that McMillin's ability to stand and walk was "25% of normal" and Dr. Langley's statement on December 19, 2001, that McMillin could stand or walk for a total of three hours in an eight-hour workday.

The ALJ noted these physicians' opinions but properly discounted them.  An ALJ may properly reject a physician's opinion of a claimant's physical residual functional capacity that contradicts the physician's own mild examination findings.  *Garza v. Barnhart*, 397 F.3d 1087, 1088-89 (8th Cir. 2005).  An ALJ may also reject a physician's opinion if it is inconsistent with the medical record as a whole.  *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002).

The ALJ discussed Dr. Williams's report of his April 1997 examination of McMillin, noting that although Dr. Williams had stated that McMillin's ability to stand and walk was "25% of normal," the objective examination findings revealed no abnormalities.  The ALJ noted that McMillin had normal limb function, range of motion, gait, coordination, and strength, and he demonstrated the  ability to walk on heel-toes and to squat and arise from that position.  X-rays of

McMillin's spine revealed normal curvature, no exostosis, and no narrowing of intervertebral space, and x-rays of McMillin's knee showed no evidence of arthritic changes and no joint space narrowing.

The ALJ also discussed Dr. Langley's opinion but determined that "the clinical and laboratory findings submitted by Dr. Langley and other medical sources simply do not support a finding that the claimant's medical condition was as limiting as described by Dr. Langley." The ALJ noted that "Dr. Langley was also apparently not aware that the claimant had, in fact, either returned to performing the duties of regular gainful employment by that date or would do so shortly after that date." (Tr. 376.) Thus, the ALJ stated, "[i]n view of the overall record, the opinions of Dr. Langley are not found to be persuasive and cannot be given great weight." (Tr. 376.)

Moreover, the evidence supports the ALJ's determination that McMillin can perform light work. McMillin's high blood pressure, diabetes, and sleep apnea have been controlled through appropriate medical treatments. McMillin's physicians consistently found, at most, evidence of only mild physical impairments in McMillin's back. At times McMillin has used no pain medication at all, and when he has used pain medication it has been mostly over-the-counter medications such as ibuprofen. *See Nelson v. Sullivan*, 966 F.2d 363, 367 (8th Cir. 1992) (ALJ properly found that claimant did not experience chronic, excruciating pain when he took only over-the-counter medications); *Wingert v. Bowen*, 894 F.2d 296, 299 (8th Cir. 1990) (noting that the claimant "did not have to take [pain] medication regularly, except aspirin every 3 to 4 days"). *See also McGinnis v. Chater*, 74 F.3d 873, 874-75 (8th Cir. 1996) (noting that claimant did not seek a regular medication regimen). McMillin engaged in a variety of daily activities, including driving, visiting friends and relatives, caring for his child, attending church regularly, running errands, shopping, and performing some household chores, such as washing the car, washing dishes, and doing laundry.

The fact that he could perform these activities supports the conclusion that he is capable of performing certain work activities. *See Brown v. Barnhart*, 390 F.3d 535, 541 (8th Cir. 2004) (ability to perform household chores, attend church, and care for a child supported finding of no standing, lifting, or walking limitations).  Furthermore, McMillin was engaged in light work from late 2001 or early 2002 until the 2005 hearing.

The ALJ's decision demonstrates that he considered all of this evidence and properly determined that McMillin has the residual functional capacity to perform light work.

**C.    The ALJ did not fail to consider McMillin's obesity and sleep apnea.**

McMillin argues that "the ALJ focused almost entirely on his back problems, but mentioned his obesity and sleep apnea only in passing," and thus failed to consider whether the combined effect of McMillin's impairments rendered him disabled.

The ALJ does not have to discuss every piece of evidence presented to satisfy his duty to fully and fairly develop the record, *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir. 1993) (per curiam), and failure to discuss a piece of evidence does not mean he failed to consider it, *see Montgomery v. Chater*, 69 F.3d 273, 275 (8th Cir. 1995).  Although the ALJ did not specifically discuss McMillin's treatment for sleep apnea, he recognized that McMillin has this disorder and noted that, considering the record as a whole, all of McMillin's impairments "have been under reasonably good control with minimal medical treatment and medication."  (Tr. 372-73.)  McMillin's medical records, as well as his own testimony, provide substantial evidence that his sleep apnea was controlled through the use of a CPAP machine.  The Eighth Circuit has held that sleep apnea does not constitute a disabling impairment when alleviated through the use of a CPAP device.  *Hilkemeyer v. Barnhart*, 380 F.3d 441, 446 (8th Cir. 2004).

The ALJ acknowledged the severity of McMillin's impairments, including his sleep apnea and obesity, at step two of the sequential evaluation process.  However, the evidence does not show that McMillin suffers any substantial limitations due to his obesity.  McMillin testified only that his obesity caused shortness of breath and contributed to his knee pain.  (Tr. 261-62.)  McMillin's physicians instructed him to lose weight to control his high blood pressure, and Dr. Eubanks opined that significant weight loss would alleviate McMillin's back pain.  The record as a whole, however, does not show that McMillin's pain or high blood pressure have resulted in any serious limitations on his ability to function.  To the contrary, he has worked in the past and continues to work despite his obesity and other impairments.

While the ALJ did not discuss McMillin's sleep apnea and obesity at length, the ALJ's decision shows that he correctly evaluated these conditions in relation to the record as a whole.  *See Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995) (ALJ did not err in declining to evaluate claimant's obesity because claimant failed to allege any limitations caused by obesity; claimant previously worked despite obesity and the medical evidence as a whole supported the ALJ's decision).

**D.      The ALJ was not required to obtain vocational expert testimony regarding McMillin's ability to work.**

McMillin asserts that the ALJ erred in not obtaining vocational expert testimony regarding McMillin's ability to work because McMillin has the nonexertional impairments of obesity and sleep apnea.  Because the ALJ properly determined that McMillin would return to his past work at step four of the sequential evaluation process, however, the ALJ was not required to consult a vocational expert to assess McMillin's ability to perform other jobs.

Vocational expert testimony is not required at step four of the process, where the claimant retains the burden of proving that he cannot perform his prior work.  *Lewis v. Barnhart*, 353 F.3d

642, 648 (8th Cir. 2003).   A claimant must demonstrate the existence of a disability before vocational expert testimony is required.   *Johnston v. Shalala*, 42 F.3d 448, 452 (8th Cir. 1994). When the claimant has not proven that he cannot perform his past work, the burden never shifts to the Social Security Commission to show the existence of alternate work that the claimant can perform, and the testimony of a vocational expert is not required.   *Id.*   Because McMillin did not prove that he could not perform his past relevant work at step four, the ALJ was not required to proceed to step five and obtain expert testimony as to whether McMillin could perform other jobs with his nonexertional impairments.   *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## CONCLUSION

The ALJ properly concluded that McMillin could perform his past relevant work.  The Court finds that the record contains substantial evidence to support the Commissioner's decision that McMillin is not disabled.  Accordingly, the Commissioner's administrative decision is affirmed.

IT IS SO ORDERED this 13th day of August, 2007.


_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE